# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____
                             )

SHERRY L. DAVIS,               )

                            )

     Plaintiff,              )

                            )

     v.                     )     Civil Action No. 01-0331 (RBW)

                            )

JOHN D. ASHCROFT,          )

                            )

     Defendant.            )
_____)

## MEMORANDUM OPINION

The plaintiff has brought this action alleging violations of both Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-16, and the Rehabilitation Act of 1973, 29 U.S.C. §§ 791 and 794. After the completion of extensive discovery, the defendant has filed a motion for summary judgement pursuant to Federal Rule of Civil Procedure 56(c). Currently before the Court are (1) the Defendant's Memorandum in Support of its Motion for Summary Judgment ("Def.'s Mem."); (2) the Plaintiff's Opposition to Motion for Summary Judgment ("Pl.'s Opp'n"); and (3) the Defendant's Reply to Plaintiff's Opposition to Motion for Summary Judgment ("Def.'s Reply"). For the reasons set forth below, the Court grants in part and denies in part the defendant's motion.

## I.   Background

The following facts are undisputed or, because the plaintiff is the party opposing summary judgment, construed in the light most favorable to her. Stewart v. Ashcroft, 352 F.3d

422, 425 (D.C. Cir. 2003).  For clarity, the Court has structured this section of the opinion

seperately to delineate the facts underlying each claim of discrimination raised by the plaintiff.

**(A)      The 1996 Non-Selection as Section Chief Claim**

In 1976, the plaintiff, an African American female, began her career with the Federal

Bureau of Investigation ("FBI").   Defendant's Statement of Material Facts Not In Dispute

("Def.'s Stmt.") ¶ 1.  In 1991, the plaintiff was promoted to Unit Chief of the FBI's Document

Classification Unit.  Id. ¶ 2.  On March 18, 1996, the FBI posted a vacancy notice for a Section

Chief position for the Administrative Resource Management ("AIRM") Section, Information

Resources Division ("IRD").  Def.'s Mem. at 5.  The notice instructed qualified applicants to

apply for the position by contacting the Executive Development Selection Program

Administrator.  Id.  According to the defendant, the names of all applicants, qualified or not,

were forwarded to the selecting official, Carolyn Morris, Assistant Director of the IRD.  Id.  The

plaintiff applied for this position but was not selected.  Def.'s Stmt. ¶ 3.  At the time of her non-

selection, the plaintiff was employed as a GS-15 Unit Chief.  Id. ¶ 4.  The person selected was a

white male who had been employed as a GS-15 Assistant Special Agent in Charge ("ASAC")[1] in

the FBI's Los Angeles Field Office at the time of his selection.  Id.  The defendant maintains that

a minium qualification for the AIRM Section Chief position was previous field management

experience as an ASAC in a field office, as opposed to having held such a position at FBI

headquarters.  Id.  For his position, the defendant relies upon an agency policy which states that

to be qualified for a Section Chief vacancy, candidates must be either Inspectors on the

---

[1] An ASAC is generally the FBI Special Agent who is second-in-command at an FBI field office.  Def.'s
Mem. at 5 n.1.

Inspection Staff or qualified ASACs, unless the Section Chief position requires a specific skill or experience.  Id. ¶ 6.  Moreover, according to the defendant, the selecting official for this Section Chief position (Morris), included the ASAC requirement for this particular Section Chief position to ensure that the Section Chief would possess the management and operational field experience essential to maintain IRD's credibility with FBI field offices and agents, and further advance IRD's mission to serve the technical and investigative needs of special agents in the field.  Id. ¶ 7.  Additionally, Morris determined that given her own lack of field office and investigative experience, the ASAC requirement was an essential qualification for her subordinates in order to maintain IRD's credibility and to obtain the necessary perspectives of field-wide investigative and technical issues essential to IRD's mission.  Id. ¶ 8.  According to the defendant, the only instance in which Morris did not require ASAC experience was when the vacant Section Chief position required particularized and unique technical experience and skills, which would  outweigh the need for ASAC experience.  Id. ¶ 9.  Because the Section Chief position at issue in this case did not require such particularized and unique technical skill or experience, the defendant contends that the ASAC experience exception was not applicable.  Id. ¶ 10.  Thus, when considering candidates for this position, all applicants who did not have ASAC experience were eliminated from consideration.  Id. ¶ 12.  In response to the defendant's representations, the plaintiff asserts that requiring ASAC experience for the Section Chief position was contrary to FBI policies and a pretext for discrimination.  Plaintiff's Statement of Genuine Issues ("Pl.'s Stmt.")  ¶ 26.

**(B)      The 1994-1998 Hostile Work Environment Claim**

        Kevin O'Brien began supervising the plaintiff sometime in 1994.  Pl.'s Opp'n at 9.

According to the plaintiff, after O'Brien began supervising her, he engaged in a pattern of harassing activity against her.  Id.  The plaintiff states that O'Brien would frequently scream at her over the telephone, talked to her in a condescending tone, and failed to involve her in matters directly related to her area of expertise.  Id.  For example, the plaintiff references an occasion when she helped O'Brien prepare for Congressional testimony, but she was not invited to attend the hearing.  Id. at 9-10.  The plaintiff asserts that based upon the alleged abusive treatment, she submitted a request to Assistant Director John Collingwood for reassignment to a position in which she would not be under O'Brien's supervision, but her request was denied.  Id. at 10.  Despite the denial of her request, the plaintiff represents that a white support staff female was transferred from O'Brien's supervision after she complained about him.  Id.

In 1997, Collingwood decided to restructure the Freedom of Information and Privacy Act ("FOIPA") section to reduce a considerable backlog of FOIPA matters.  Def.'s Mem. at 35.  In this reorganization, Collingwood separated the Litigation Unit from the FOIPA section.  Id.  Despite the plaintiff's seniority, she claims that she was never consulted regarding the creation of the separate Litigation Unit even though Collingwood consulted with white employees within the division on the subject.  Pl.'s Opp'n at 12.  The plaintiff was ultimately assigned as Chief of this new Litigation Unit.  Def.'s Stmt. ¶ 2.  The plaintiff represents that, after being assigned as the Unit Chief of the Litigation Unit, the pattern of discrimination intensified.  Pl.'s Opp'n at 10.  First, according to the plaintiff, O'Brien attempted to dissuade employees from transferring to the plaintiff's unit and limited the resources made available to her.  Pl.'s Opp'n at 12.  Moreover, the plaintiff contends that she was excluded from certain meetings, including a meeting with then Attorney General Janet Reno and other meetings which had a direct impact on her unit.  Id.

Additionally, the plaintiff alleges that she was denied the resources she needed to effectively perform her job.  Specifically, she asserts that her new office was "filthy, unfurnished, and had poor ventilation, and had never before been used as a unit chief's office."  Id. at 11.  Further, she was not given a speaker telephone even though some lower-ranked white support staff members in the division were supplied with one.  Id.  The plaintiff also contends that she was discriminated against because one-third of the Litigation Unit's space was reassigned to another unit, O'Brien continued to frequently talk to the plaintiff in a loud tone, she did not receive quality step increases while under the supervision of O'Brien, and her unit's appeals reclassification function was reassigned back to the Document Classification Unit ("DCU").  Def.'s Mem. at 43-48.

Moreover, the plaintiff claims that in 1998, she was stripped of her duties as Unit Chief of the Litigation Unit.  Pl.'s Opp'n at 13.  According to the plaintiff, in November 1998, she discovered a stack of memoranda addressed to Collingwood that detailed a plan drafted by O'Brien, which was designed to eliminate the backlog of classification appeals.  Id. at 13-14.  The plan called for the reassignment of the classification appeals function to Nancy Steward, a while female who did not have a bachelors degree.  Id. at 14.  Collingwood later followed the suggestions that had been made in the memoranda and transferred to Steward the classification appeals function.  Id.  According to the plaintiff, following this reassignment, she "became an emotional wreck."  Id.  She was nauseous, unable to sleep, and had severe emotional challenges.  Id.  These events lead the plaintiff to take leave in an attempt to recover from the trauma caused by the reassignment.  Id. at 14-15.  This need to take leave resulted in the plaintiff taking an extended medical leave of absence, which began on November 17, 1998.  Id.  Thereafter, the

plaintiff never returned to work. Id. at 34.

**(C)      The Leave of Absence and Fitness for Duty Examination ("FFD") Claim**

On November 17, 1998, the plaintiff left a handwritten note along with a doctor's slip for

her supervisor, which indicated that she was taking medical leave for at least a month due to

work related stress. Def.'s Mem. at 49. On December 9, 1998, the plaintiff asked to be

continued on medical leave and stated that her doctor had advised her not to have contact with

the office except for "severe emergencies." Id. On January 20, 1999, the plaintiff requested that

she be placed on leave without pay. Id. The plaintiff was then on unpaid leave for over a year,

when on March 15, 2000, she sent Collingwood a note advising him that she planned to return to

work on Monday, March 27, 2000. Pl.'s Mem. at 15. Along with this note, the plaintiff also sent

a release from her doctor, Dr. Welsing, which indicated that the plaintiff could return to full time

employment on that date. Id.

Upon receipt of the note, John Kelso, who had replaced O'Brien after his retirement,

wrote a note to Collingwood which stated that the plaintiff's note was "something of a surprise,

and also potentially very disruptive, especially with [an] inspection starting one week after her

return." Pl.'s Mem. at 16. On March 24, 2000, Donald Bartnik, Section Chief of the Personnel

Assistance Section, wrote a letter to the plaintiff and informed her that the note submitted by Dr.

Welsing was insufficient to make a determination about the plaintiff's ability to return to work.

Id. at 16. The letter informed the plaintiff that she would be required to take a fitness-for-duty

examination before she could return. Id. According to the plaintiff, when officials at the FBI

met to discuss her situation, which led to the issuance of Bartnik's March 24, 2000 letter, the

officials also discussed the possibility of sending the plaintiff for a psychological examination

and terminating her because she had overextended the time she was on leave without pay.  Id. at

16-17.  On March 24, 2000, Bartnik also sent a letter to Dr. Welsing requesting additional

information that the FBI said it needed before it could determine whether the plaintiff would be

able to return to work.  Id.  The supplemental report was submitted by Dr. Welsing on April 13,

2000.  Def.'s Mem. at 58

On March 29, 2000, the plaintiff passed the fitness-for-duty physical examination, which

was performed by Dr. James Yoder.  Id. at 18; Def.'s Mem. at 57.  During the examination, the

plaintiff stated that she was still taking psychotropic medication.  Def.'s Mem. at 57.  On April

12, 2000, Bartnik notified the plaintiff that she would be required to take a psychological FFD

examination to further assess her fitness to return to work.  Id.  According to the defendant, Dr.

Yoder had input into the decision and agreed with it.  Id.  However, Dr. Yoder's report

concerning his evaluation of the plaintiff was not issued until May 9, 2000.  Pl.'s Opp'n at 19.

The plaintiff went to the Isaac Ray Center in Chicago, Illinois on June 8 and 9, 2000, for

the psychological examination.  Pl.'s Opp'n at 23; Def's Mem. at 60.  In late-June 2000, Doctors

David Hartman and Peter Fink sent separate reports to the FBI indicating that the plaintiff was

unfit for duty.  Pl.'s Opp'n at 24-28; Def.'s Mem. at 61.  In a letter dated July 28, 2000, the FBI

notified the plaintiff of the results of her June 2000 psychological examination.  Def.'s Mem. at

62.  The letter explained that the doctors at the Isaac Ray Center concluded that the plaintiff was

not fit to return to duty because her mental disorder impaired her ability to perform her duties and

responsibilities.  Id. at 63.  In addition, the letter notified the plaintiff that to maintain her FBI

employee status, she would be required to submit to additional medical and neurological

evaluations and testing.  Id.  The FBI also mandated that the plaintiff submit monthly reports

from her doctors specifying whether she had been compliant with the recommended examinations and treatment, along with reports on her progress.  Id. at 63.  The plaintiff submitted these reports in December 2000 and January 2001.  Id. at 64-65.  Following the receipt of the reports, the plaintiff was notified in a letter dated January 31, 2001, that she had been scheduled for a re-evaluation at the Isaac Ray Center on February 6-7, 2001.  Id. at 65.  Prior to her re-examination, the plaintiff submitted an evaluation from a privately retained doctor, Dr. Robert Bell Mapou, that supported her position that she should be reinstated.  Pl.'s Opp'n at 30. Despite this supplemental report, on July 27, 2001, the plaintiff submitted her notice that she intended to retire from the FBI effective August 29, 2001.  Pl.'s Opp'n at 34.  Nonetheless, after receiving this notice, the FBI decided that the plaintiff should still undergo the re-evaluation because she could change her position about retirement.  Def.'s Mem. at 67.  A second evaluation occurred on July 30-31, 2001, however, the Isaac Ray Center refused to issue reports regarding this re-examination because the plaintiff had allegedly threaten to take legal action against the doctors.  Id. at 67.

**(D)      The 1999 Non-Selection as Section Chief Claim**

Following the plaintiff taking medical leave in November 1998, her immediate supervisor, Section Chief Kevin O'Brien, retired.  Pl.'s Opp'n at 9.  Despite the plaintiff's alleged continued notification to the FBI management that she desired a promotion to an SES position, the plaintiff was not advised of the vacancy of O'Brien's former position.  Id.  The position was ultimately awarded to a white male, John Kelso, another Unit Chief in the FOIPA section.  Id.

## II.     Standard of Review

This Court will grant a motion for summary judgment under Rule 56(c) if "the pleadings,

depositions, answers to interrogatories and admissions on file, together with the affidavits or

declarations, if any, demonstrate that there is no genuine issue as to any material fact and that the

moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  When ruling on

a motion for summary judgment, this Court must view the evidence in the light most favorable to

the non-moving party.  Bayer v. United States Dep't of Treasury, 956 F.2d 330, 333 (D.C. Cir.

1992).  However, the non-moving party cannot rely on "mere allegations or denials . . . , but . . .

must set forth specific facts showing that there [are] genuine issue[s] for trial."  Anderson v.

Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (citation omitted).  Under Rule 56, "if a party fails

to establish the existence of an element essential to that party's case and on which that party will

bear the burden of proof at trial" summary judgment is warranted.  Hazward v. Runyon, 14 F.

Supp. 2d 120, 122 (D.D.C. 1998) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)).

The party moving for summary judgment bears the burden of establishing the absence of

evidence to support the non-moving party's case.  Id.  In considering a motion for summary

judgment, "the court must draw all reasonable inferences in favor of the nonmoving party, and it

may not make credibility determinations or weigh the evidence."  Reeves v. Sanderson Plumbing

Prods., Inc., 530 U.S. 133, 150 (2000).

## III.     Title VII and the Rehabilitation Act

The plaintiff alleges violations of both Title VII of the Civil Rights Act of 1964, 42

U.S.C. § 2000e-16, and the Rehabilitation Act of 1973, 29 U.S.C. §§ 791, 794.  Compl. ¶¶ 16-19.

Under Title VII, "[a]ll personnel actions affecting employees . . . shall be made free from any

discrimination based on race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-16(a).

Under the Rehabilitation Act, "[n]o otherwise qualified individual with a disability . . . shall,

solely by reason of her or his disability, be . . . subjected to discrimination under any program or

activity . . . conducted by any Executive agency. . . ." 29 U.S.C. § 794.  To prove a claim of

discrimination under either Title VII or the Rehabilitation Act, the plaintiff can present direct

evidence of discrimination or the plaintiff can rely on the McDonnell Douglas burden shifting

framework in the absence of direct evidence.  McDonnell Douglas Corp. v. Green, 411 U.S. 792,

802-03 (1973); see McGill v. Munoz, 203 F.3d 843, 845 (D.C. Cir. 2000) (discussing proof

required for Rehabilitation Act claims); Mitchell v. Baldrige, 759 F.2d 80, 84-85 (D.C. Cir.

1985) (applying the McDonnell Douglas burden shifting framework to Title VII claims).

The plaintiff alleges race and gender discrimination under both the disparate treatment

and disparate impact doctrines, and she also makes a claim of retaliation.  Disparate treatment

discrimination occurs when "[t]he employer simply treats some people less favorably than others

because of their race, color, religion, sex or national origin."  International Bhd. of Teamsters v.

United States, 431 U.S. 324, 335 n. 15 (1977).  In cases of disparate treatment discrimination, a

"proff of discriminatory motive is critical . . . ."  Id.  On the other hand, disparate impact claims

of discrimination "involve employment practices that are facially neutral in their treatment of

different groups but that in fact fall more harshly on one group than another and cannot be

justified by business necessity."  Id.  However, when a claim of disparate impact discrimination

is advanced, a "proof of discriminatory motive . . . is not required . . . ."  Id.   Title VII also

protects employees from retaliation by employers for engaging in a protected activity.  42 U.S.C.

§ 2000e-3(a).

(A)     **Disparate Treatment Discrimination**

In race discrimination cases alleging disparate treatment, the plaintiff can satisfy her burden by introducing direct evidence of discriminatory intent or indirect evidence of discriminatory intent.  See McGill v. Munoz, 203 F.3d 843, 845 (D.C. Cir. 2000).  Under the framework established in McDonnell Douglas, 411 U.S. at 792, to establish a claim under Title VII of the Civil Rights Act of 1964 through indirect evidence, the plaintiff must first establish a prima facie case of discrimination.  Id. at 802.  A prima facie case of race or gender discrimination requires the plaintiff to show:  (1) that she belongs to a protected class; (2) that she applied and was qualified for a job that the employer was trying to fill; (3) though qualified, she was not selected; and (4) the unfavorable action supports an inference of discrimination.  Id. This is not an onerous burden.  Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981).  Once the plaintiff has satisfied this requirement, the burden then shifts to the employer to articulate legitimate, non-discriminatory reason for the challenged employment decision.  Id. However, the employer is not required to support these reasons with objective evidence sufficient to satisfy the "preponderance of the evidence" standard.  Burdine, 450 U.S. at 259-60.

Once the defendant presents a legitimate, non-discriminatory reason for the challenged employment decision, then "'the McDonnell Douglas framework—with its presumptions and burdens'—disappear[s], and the sole remaining issue [is] discrimination vel non." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142-43 (2000) (internal citations omitted).  At this point, the plaintiff must show that a reasonable jury could conclude from all of the evidence that the adverse employment decision was made for a discriminatory reason.  See Aka v. Washington Hosp. Ctr., 156 F.3d 1284, 1290 (D.C. Cir. 1998) (en banc).  Specifically, this Court

must consider whether a jury could infer discrimination from (1) the plaintiff's prima facie case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation; and (3) any further evidence of discrimination that may be available to the plaintiff.  Waterhouse v. District of Columbia, 298 F.3d 989, 992-93 (D.C. Cir. 2002) (citing Aka, 156 F.3d at 1289).  The plaintiff need not present evidence in each of these categories in order to avoid summary judgment; rather, the Court must assess the plaintiff's challenge to the employer's explanation in light of the total circumstances of the case.  Aka, 156 F.3d at 1289-91.

**(B)      Disparate Impact Discrimination**

When a claim of disparate impact discrimination is made, the Court also employs a three-step burden-shifting analysis, similar to the McDonnell Douglas framework.  First, the plaintiff must establish a prima facie case of discrimination.  Albemarle Paper Co. v. Moody, 422 U.S. 405, 425 (1975).  The prima facie case "may be established by policies or practices that are neutral on their face and in intent but that nonetheless discriminate in effect against a particular group."  Int'l Bhd. of Teamsters, 431 U.S. at 349.   Next, the burden shifts to the employer to "demonstrate that the challenged practice is job related for the position in question and consistent with business necessity."  42 U.S.C. § 2000e-2(k)(1)(A)(I); see also Griggs v. Duke Power Co., 401 U.S. 424, 431 (1971).  And finally, if the defendant has demonstrated business necessity, the plaintiff must show that an alternative employment practice could meet the employer's legitimate needs without a similar discriminatory effect.  42 U.S.C. § 2000e-2(k)(1)(A)(ii); see also Albemarle Paper Co., 422 U.S. at 425.

**(C)     Retaliation**

Title VII also protects employees from retaliation for having "opposed any practice made

an unlawful employment practice by this title" or for having "made a charge, testified, assisted,

or participated in any manner in an investigation, preceding, or hearing under this title."  42

U.S.C. § 2000e-3(a).  To demonstrate retaliation under Title VII, the plaintiff must show (1) that

she engaged in a protected activity; (2) that she suffered an adverse action caused by her

employer; and (3) that there is a causal link between the protected activity and the employment

decision or action.  Thomas v. Nat'l Football League Players Assn., 131 F.3d 198, 202 (D.C. Cir.

1997), vacated in part on other grounds, 1998 WL 1988451 (D.C. Cir. 1998).  And, like other

claims under Title VII, a claim of retaliation invokes application of the McDonnell Douglas

framework in the absence of direct evidence of discrimination.  See Lathram v. Snow, 336 F.3d

1085, 1089 n.3 (D.C. Cir. 2003) ("The McDonnell Douglas framework, with some differences in

the phrasing of the prima facie case, applies to [the plaintiff's] claim of unlawful retaliation")

(citing Morgan v. Fed. Home Loan Mortg. Corp., 328 F.3d 647, 651 (D.C. Cir. 2003)).

## IV.   Legal Analysis

**(A)     The Plaintiff's 1996 Non-Selection as Section Chief of the Resource Management**

**           Division**

**      (1)     Discriminatory Treatment Claim on the Basis of Race or Gender**

The plaintiff's first claim alleges that she was the victim of disparate treatment

discrimination based on gender and race because the defendant failed to promote her to the

position of Section Chief in the Resource Management Division in 1996.  Compl. ¶ 7.  The

defendant contends that the plaintiff has failed to meet her burden of establishing disparate

treatment discrimination under the McDonnell Douglas framework.  Def.'s Mem. at 9.  At the

time of her non-selection, the plaintiff was employed as a GS-15 Unit Chief in the Document

Classification Unit of the IRD at the FBI headquarters facility.  Def.'s Mem., Defendants's

Exhibits in Support of Motion for Summary Judgment ("Def.'s Ex.") 4.  The person selected for

the Section Chief position was a white male, who was employed as a GS-15 ASAC in the FBI's

Los Angeles Field Office at the time of his selection.  Def.'s Ex. 5.  This court must apply the

McDonnell Douglas test to determine whether the plaintiff's disparate treatment claim can

survive summary judgment.[2]

First, application of the McDonnell Douglas analysis requires this Court to determine

whether the plaintiff has established a prima facie case of discrimination.  Because the plaintiff is

an African American female and was not selected in 1996 for the Section Chief position, the

defendant's only contention is that the plaintiff has failed to satisfy the third-prong of her prima

facie case—that she was qualified for the position of Section Chief.  Def.'s Mem. at 9-10.  The

defendant contends that the Section Chief position required the successful applicant to have

ASAC experience.  Thus, because it is uncontested that the plaintiff did not have such

experience, the defendant opines that the plaintiff has failed to establish a prima facie case of

---

[2]  The plaintiff first contends that the McDonnell Douglas framework does not need to be applied in this case because she does not need to show discrimination through indirect evidence since she has direct evidence of discrimination.  Pl.'s Opp'n at 72-73.  Specifically, the plaintiff presumes that the evidence shows that Carolyn Morris, the selecting official, stated after receiving the initial applications for the Section Chief position that she "called Tim McNally and asked him if he would help me beat the bushes and get some people who would be interested in this and what you see here is the result of this intervention . . . ." Pl.'s Opp'n at 42 & Plaintiff's Exhibits in Opposition to Motion for Summary Judgment ("Pl.'s Ex.") 17.  Direct evidence of discrimination is evidence that, "if believed by the fact finder, proves the particular fact in question" without any need of an inference.  Randle v. LaSalle Telecomms., Inc., 876 F.2d 563, 569 (7th Cir. 1989) (emphasis added).  "In the context of Title VII, direct evidence includes any statement or written document showing a discriminatory motive on its face."  Portis v. First Nat'l Bank of New Albany, 34 F.3d 325, 329 (5th Cir. 1994) (emphasis added).  What has been proffered by the plaintiff is clearly not direct evidence of discrimination.  So the plaintiff's first position must be rejected.

discrimination.  Id.  The plaintiff counters that ASAC experience was not a prerequisite for acquiring the Section Chief position.  Pl.'s Opp'n at 7.

The actual job announcement simply announced the position vacancy and did not list the requisite qualifications for the position.  Pl.'s Ex. 14.  The parties cite different portions of the FBI Manual of Administrative Operations and Procedures to support their respective arguments.  Pl.'s Ex. 15; Def.'s Ex. 13.  The section of the manual cited by the plaintiff states that the career path to the becoming a Section Chief requires "[p]roven performance at mid-level management," and "[s]election by [the] Senior Executive Service Board."  Pl.'s Ex. 15 at 3.  However, the defendant cites to a portion of the manual which states that the Senior Executive Service Board will recommend to the Director for approval "qualified candidates from the structured career management path from either Inspectors on the Inspection Staff or qualified ASACs."  Def.'s Ex. 13.  The only exception to the section cited by the defendant listed in the FBI Manual is for those jobs requiring special skills or expertise.  Id.; Def.'s Ex. 10B (Morris Supp. Decl.) at 1-4.  But, the plaintiff argues that in practice no previous ASAC experience was required to become a Section Chief.  Pl.'s Opp'n at 74-75.  To support her claim, the plaintiff contends that of the 196 Special Agents that were selected as Section Chiefs after 1989, 52 had no prior ASAC experience.  Id. at 75.  Moreover, the plaintiff alleges that Carolyn Morris, the selecting official, and Gordon Zacrep, her deputy, were not ASACs.  Id.  The defendant counters that Zacrep was not selected by Morris, and that Morris, as a selecting official, always employed the ASAC requirement, in part due to her lack of such experience.  Def.'s Mem at 11; Def.'s Ex. 10B

(Morris Supp. Decl.) at 2-3.[3]

Based upon the foregoing, there are clearly factual disputes as to whether the ASAC

requirement was actually an agency policy or was merely included because Morris decided it was

an appropriate consideration.  See Def.'s Ex. 10A at FBI-D8-1607, 10B at FBI-D8-1612.

Accordingly, this Court cannot conclude that the plaintiff's lack of ASAC experience was a per

se disqualifier for the Section Chief position for which she applied.  Thus, the question of

whether the plaintiff was qualified for this position is a question that must be resolved by the

jury, not this Court.

The defendant argues, in the alternative, that, even assuming that the plaintiff has

satisfied her prima facie case obligation, he is nonetheless entitled to summary judgment on her

1996 non-selection claim because the plaintiff has not rebutted the FBI's non-discriminatory

reason for her non-selection.  Def.'s Mem. at 14-17.  Under McDonnell Douglas, once the

plaintiff satisfies her burden of establishing a prima facie case of discrimination, the burden

shifts to the defendant to articulate a legitimate, non-discriminatory reason for the plaintiff's non-

selection for the Section Chief position.  McDonnell Douglas, 411 U.S. at 802-04.  And "[e]ven

if a court suspects that a job applicant 'was victimized by [ ] poor selection procedures' it may

not 'second-guess an employer's personnel decision absent demonstrably discriminatory

---

[3]  The defendant also alleges that the plaintiff cannot prove a prima facie case of retaliation as to the ASAC
requirement because the plaintiff has offered no evidence of a causal connection between her prior EEO activity and
the inclusion of the ASAC requirement.  Pl.'s Mem. at 13-14.  Despite alleging that her non-selection in 1996 was
based upon retaliation, the plaintiff fails to address the defendant's causal connection argument.  Therefore, this
Court must assume that the plaintiff has conceded this point and the defendant is entitled to summary judgment on
this part of the claim.  See Carter v. George Washington Univ., 387 F.3d 872, 878 (D.C. Cir. 2004) ("For a
retaliation claim, the plaintiff must show that '(1) she engaged in a statutorily protected activity; (2) she suffered an
adverse employment action; and (3) there is a causal connection between the two.'") (quoting Taylor v. Small, 350
F.3d 1286, 1292 (D.C. Cir. 2003).

motive.'" Fischbach v. District of Columbia Dep't of Corrections, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (quoting Milton v. Weinberger, 696 F.2d 94, 100 (D.C. Cir.1982)).

As discussed above, the defendant contends that the decision not to select the plaintiff for the Section Chief position was not based on race, sex or her prior EEO activity, but rather because of her lack of ASAC experience.  Def.'s Mem. at 16.  According to the defendant, the ASAC requirement was included as a requirement for the position of Section Chief because the IRD serves field offices, and therefore, it was logical to require the Section Chief of the IRD to have ASAC field office experience.  Id.  Moreover, Morris, the selecting official, did not have field experience, which in her view made it "imperative that the majority of [her] Section Chief's have previous extensive operational and management experiences in the field."  Def.'s Mem. at 16 (quoting Def.'s Ex. 10 (Morris Declaration) at 1-2.).

Having concluded that the defendant has stated a legitimate, non-discriminatory basis for its employment decision, the plaintiff must show that a reasonable jury could conclude from all of the evidence that the adverse employment decision was made for a discriminatory reason.  See Aka, 156 F.3d at 1290.  Specifically, this Court must now consider whether a jury could infer discrimination from (1) the plaintiff's prima face case; (2) any evidence the plaintiff has presented to attack the employer's proffered explanation; and (3) any further evidence of discrimination that is available to the plaintiff.  Waterhouse, 298 F.3d at 992-93.  The plaintiff opines that she has satisfied this burden because the record evidence indicates that the ASAC requirement was actually a pretext for discrimination.  Pl.'s Opp'n at 75.  To support her argument, the plaintiff alleges that (1) there is no record evidence that the ASAC requirement was a prerequisite for this Section Chief position; (2) the ASAC experience requirement was an

ad hoc practice established by Morris's predecessor which she continued to employ; (3) a large

number of Section Chiefs did not have prior ASAC experience; (4) the plaintiff's expert report

showed that ASAC and Unit Chief positions were substantially similar and thus ASAC

experience was not necessary; and (5) Morris sought candidates with ASAC experiences only

after she became aware that the initial candidate pool contained a large number of minorities who

lacked ASAC experience.[4]  Id. at 75-78.  The defendant argues, however, that as to the ASAC

requirement, the plaintiff is conflating the analysis applicable to a disparate impact claim with the

analysis that applies to a disparate treatment claim.  Def.'s Reply at 4.  Specifically, the

defendant contends that regarding a disparate treatment claim, the FBI does not need to show that

the ASAC requirement was part of an official written policy.  Id. at 8.  Rather, the defendant

notes that concerning a disparate treatment claim, an employer only needs to articulate a

legitimate, non-discriminatory reason for its decision and the plaintiff must then establish that the

articulated reason was a pretext for discrimination.  Id. at 9.  And, the defendant contends that the

plaintiff has failed to rebut the legitimate, non-discriminatory reason articulated by the defendant.

Courts cannot permit themselves to be used as "'super-personnel department[s] that

reexamine[ ] an entity's business decision[s].'"  Stewart, 352 F.3d at 429 (quoting Dale v.

Chicago Tribune Co., 797 F.2d 458, 464 (7th Cir. 1986)).  Moreover, under the McDonnell

Douglas framework, the question is not the "the correctness or desirability of [the] reasons

offered . . . [but] whether the employer honestly believes in the reasons it offers." Fischbach, 86

F.3d at 1183 (quoting McCoy v. WGN Continental Broadcasting Co., 957 F.2d 368, 373 (7th

---

[4] The plaintiff also alleges the existence of direct evidence of discrimination.  However, as already discussed, see supra p. 14 n.2, the evidence proffered by the plaintiff as direct evidence of discrimination is clearly not direct evidence.

Cir. 1992)).  Accordingly, absent a "demonstrably discriminatory motive," this Court must defer to the agency's decision of what non-discriminatory qualities it deemed necessary in filling the Section Chief position.  Id. (quoting  Milton v. Weinberger, 696 F.2d 94, 100 (D.C. Cir. 1982)). In this case, the arguments made by the plaintiff are in essence asking this Court to second guess whether it was appropriate to apply the ASAC requirement to the Section Chief position, rather than actually rebutting the legitimate, non-discriminatory reason offered by the agency.  For example, it is clear that a factual dispute exists as to whether prior ASAC experience was an absolute requirement for the Section Chief position, and that the selecting official had the option of either using or not using this historical factor.  However, the fact that this requirement may have been an optional qualification does not rebut the defendant's legitimate, non-discriminatory reason for requiring ASAC experience for the position.  Nor does the fact that the selecting official acted in conformity with her belief that ASAC experience was necessary for the position and actively sought candidates with that qualification after no one with such experience applied, Pl.'s Ex. 17, rebut the defendant's proffered reason.  Additionally, the defendant has set forth a legitimate reason why ASAC experience was imposed for this and many other Section Chief positions, but not for others, i.e., positions requiring technical knowledge or experience versus positions not requiring such attributes.  And the plaintiff has not rebutted this legitimate, non-discriminatory reason, but simply contends that if the ASAC policy is applied to any Section Chief position, it must be applied to all such positions.  Pl.'s Opp'n at 76.

The plaintiff also claims that the defendant's alleged need to impose the ASAC requirement is contrary to his own expert's report from Elizabeth Kolmstetter, which indicates that the ASAC and Unit Chief positions are substantially identical.  Pl.'s Opp'n at 77.  Despite

the plaintiff's assertions that these jobs are similar, and thus should lead to the conclusion that

tenure in either should be a sufficient prerequisite to acquiring the Section Chief position, such

logic does not rebut the defendant's legitimate, non-discriminatory reason for applying the ASAC

requirement to the position at issue here.  In fact, all of the foregoing arguments made by the

plaintiff simply challenge the soundness of applying the ASAC requirement, not rebuttal of the

agency's proffered explanation.  See Fischbach, 86 F.3d at 1183 (quoting McCoy v. WGN

Continental Broadcasting Co., 957 F.2d 368, 373 (7th Cir. 1992) ("Once the employer has

articulated a non-discriminatory explanation for its action . . . the issue is not 'the correctness or

desirability of [the] reasons offered . . . [but] whether the employer honestly believes in the

reasons it offers.'").  Accordingly, these arguments fall short of the mark set by the McDonnell

Douglas framework.

   Finally, the plaintiff argues that pretext is demonstrated in this case because application

of the ASAC requirement effectively eliminated all African American female candidates since

there were, at the time of the plaintiff's non-selection, only two GS-15 Special Agents who were

African American women and neither had ASAC experience.  Pl.'s Opp'n at 77.  Thus,

according to the plaintiff, there is statistical proof in the record of discrimination.  Id. at 77-78.

"Statistical evidence is crucial in disparate impact cases, where plaintiffs need not prove

discriminatory intent but must show that specific employment practices 'select applicants . . . in a

racial pattern significantly different from that of the pool applicants.'"  Krodel v. Young, 748

F.2d 701, 709 (D.C. Cir. 1984).  In a disparate treatment case, a "plaintiff may employ statistics

concerning the employment practices of the defendant to rebut explanatory defenses as

pretextual."  Cook v. Boorstin, 763 F.2d 1462, 1468 (D.C. Cir. 1985).  However, "[i]n individual

disparate treatment cases, statistical evidence is less significant because the ultimate issue is

whether the particular plaintiff was the victim of an illegitimately motivated employment

decision." Krodel, 748 F.2d at 709 (emphasis in original). Thus, while such evidence is

admissible is disparate treatment cases, it is ordinarily not dispositive. Id. (citing Furnco Constr.

Co. v. Waters, 438 U.S. 567 (1978)). For example, in Miller v. Lyng, 660 F. Supp. 1375 (D.D.C.

1987), a former member of this court acknowledged that "statistical evidence such as this

standing alone is not dispositive . . . ." Id. at 1380 (citing Furnco Constr. Co., 438 U.S. at 580).

Nevertheless, the Miller court concluded that the statistical evidence taken together with other

evidence presented in that case, including "the lack of any real non-discriminatory explanation by

the defendant," supported the conclusion that the plaintiff was discriminated against. Id. Miller

is simply not analogous to this case because there is no other evidence in the record to support

the plaintiff's claim. Accordingly, because this Court has already concluded that the plaintiff has

not otherwise rebutted the legitimate, non-discriminatory reason proffered by the FBI for her

non-selection, the only remaining evidence she has offered to rebut the government's reason is

the statistical evidence. As noted, however, such evidence, although the centerpiece of a

disparate impact claim, is merely evidence that has relevance to a disparate treatment claim. And

because such evidence alone does not demonstrate pretext, the plaintiff's disparate treatment

claim cannot survive the defendant's summary judgment motion. Accordingly, this Court need

not engage in an analysis of the expert reports submitted by the parties.

### (2)     Does the ASAC Requirement Have a Disparate Impact on African Americans and Females?

As set forth earlier, a prima facie case of a disparate impact discrimination claim can be

established with evidence showing that although the policies or practices of the agency are neutral on their face and are devoid of discriminatory intent, they nonetheless have a discriminatory effect on a particular group.  Int'l Bhd. of Teamsters, 431 U.S. at 349.  Once this burden is satisfied, the employer must  "demonstrate that the challenged practice is job related for the position in question and consistent with business necessity."  42 U.S.C. § 2000e-2(k)(1)(A)(I); see also Griggs, 401 U.S. at 431.  If the defendant has demonstrated business necessity, the plaintiff then must show that an alternative employment practice could meet the employer's legitimate needs without having a similar discriminatory effect.  42 U.S.C. § 2000e-2(k)(1)(A)(ii); see also Albemarle Paper Co., 422 U.S. at 425.

The plaintiff argues that the statistical evidence provided by her expert, Dr. Madden, establishes a prima facie case of her claim of disparate impact discrimination.  Pl.'s Opp'n at 78. The defendant alleges, however, that he is entitled to summary judgment on this claim because the plaintiff's expert report is fundamentally flawed for a number of reasons, and thus the plaintiff has failed to establish a prima facie case of this claim.  Def.'s Mem. at 19.  Dr. Madden analyzed in her report, Pl.'s Ex. 57, "whether the selections of Special Agents for promotions into Senior Executive Service (SES) and into the position of Section Chief are neutral with respect to race and gender."  Id. at 1.  Using a multiple pool analysis, Dr. Madden opines that her analysis demonstrates gender and racially discriminatory promotion practices at the FBI.  Id. at 9. The defendant has submitted his own expert report that was prepared by Dr. Huddle.  Def.'s Ex. 89.  According to Dr. Huddle, the analysis conducted by Dr. Madden "is inherently flawed and is likely to systematically depress the true representation of white males in the pool of candidates from which agents to be promoted are being chosen."  Id. at 2.

Assuming, without deciding, that the plaintiff has met her initial burden, her disparate impact discrimination claim nevertheless cannot be maintained because she has failed to set forth an alternative practice which would avoid the alleged disparate impact.  The defendant has articulated a legitimate business necessity for requiring ASAC experience.  This explanation is supported by a job analysis study conducted by Psychological Services, Inc. ("PSI study).  Def.'s Ex. 14.  This study, initiated before this lawsuit was commenced, identified the critical tasks important for successful performance in the ASAC and Section Chief positions and concluded that a number of critical tasks for successful performance in the Section Chief position directly correspond to experience gained through service as a field level ASAC.  Id. ¶ 8.  Thus, this study substantiates the agency's decision to include ASAC experience as a requirement for the Section Chief position as a matter of business necessity.  Accordingly, the burden shifts to the plaintiff to establish that other "tests or selection devises, without a similarly undesirable racial [and gender] effect, would also serve the employer's legitimate interest in 'efficient and trustworthy workmanship.'"  Albemarle Paper, 422 U.S. at 425 (quoting McDonnell Douglas, 411 U.S. at 801).  As satisfaction of this burden, the plaintiff opines that the alternative "is simply to do away with the requirement."  Pl.'s Opp'n at 89.  Without much explanation, the plaintiff suggests that because there are other Section Chiefs who do not possess ASAC experience, it is not actually a necessary requirement.  Id.  The plaintiff's position is flawed for several reasons.  First, it does not appear to take into account the fact that the ASAC qualifier is not always a prerequisite for every Section Chief opening, i.e., it is only used when technical experience or knowledge is not required.  The plaintiff simply contends that since some Section Chiefs do not have ASAC

experience or knowledge, such experience is not really needed.[5]  By failing to distinguish between Section Chief positions requiring technical experience or knowledge and those not requiring such attributes, the plaintiff's argument misses the mark.  Moreover, the plaintiff has offered no evidence to show that removing the ASAC requirement would eliminate the alleged discriminatory impact she is challenging.  Consequently, the plaintiff has offered no evidence to satisfy the final prong of the disparate impact discrimination test.  Accordingly, the defendant is entitled to summary judgment on this claim.   See Talev v. Reinhardt, 662 F.2d 888, 897 (D.C. Cir. 1980) (noting that the plaintiff did not come forth with any evidence indicating that the discriminatory effects of a business decision could be avoided by adopting alternative methods and thus summary judgment for the defendant was appropriate); Rudder v. District of Columbia, 890 F. Supp. 23, 46-48 (D.D.C. 1995) (same).

**(B)      The Plaintiff's Hostile Work Environment Claim**

The plaintiff also asserts a hostile work environment claim.  Compl. ¶ 9.  To establish a prima facie case of a hostile work environment claim the plaintiff must demonstrate that (1) the she is a member of a protected class; (2) she was subjected to unwelcome harassment; (3) the harassment was based upon the plaintiff's inclusion in a protected class; (4) the harassment had the effect of unreasonably interfering with the plaintiff's work performance and created a hostile working environment; and (5) there is a basis for holding the employer liable for the creation of

---

[5]  While unclear, it appears that the plaintiff is asserting that the ASAC requirement is inconsistent with the defendant's own expert's report from Elizabeth Kolmstetter.  Pl.'s Opp'n at 77.  Specifically, Dr. Kolmstetter's report, which interpreted the PSI study, found that the ASAC and the Unit Chief positions are substantially identical.  Id.  Therefore, the plaintiff argues that the ASAC experience requirement is unnecessary.  Pl.'s Opp'n at 77.  However, while the positions are substantially identical, the plaintiff's argument fails to address whether the differences have any impact on the required qualifications for the Section Chief position, including field level experience.

the hostile working environment.  Lester v. Natsios, 290 F. Supp. 2d 11, 22 (D.D.C. 2003) (citing

Jones v. Billington, 12 F. Supp. 2d 1, 11 (D.D.C. 1997), aff'd, 1998 WL 389101 (D.C. Cir. June

30, 1998)).  To satisfy these elements of this claim within the context of the protections provided

by Title VII, the plaintiff must show that the workplace was permeated "with discriminatory

intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of

the victim's employment . . . ."  Barbour v. Browner, 181 F.3d 1342, 1347-48 (D.C. Cir. 1999) .

And "standards for judging hostility are sufficiently demanding to ensure that Title VII does not

become a 'general civility code.'"  Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998)

(citing Oncale v. Sundowner Offshore Serv., Inc., 523 U.S. 75, 80 (1998)).  When determining

whether the alleged harassment rises to this level, courts must consider the totality-of-the-

circumstances, including: (1) the frequency of the harassing conduct; (2) its severity; (3) whether

it is physically threatening or humiliating; and (4) whether it unreasonably interferes with an

employee's work performance.  Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993).  Moreover,

in conducting this analysis, courts must be mindful that

> [e]veryone can be characterized by sex, race, ethnicity or (real or perceived) disability;
> and many bosses are harsh, unjust, and rude.  It is therefore important in hostile work
> environment cases to exclude from consideration personnel decisions that lack a linkage
> of correlation to the claimed grounds of discrimination.  Otherwise, the federal courts will
> become a court of personnel appeals.

Bryant v. Brownlee, 265 F. Supp. 2d 52, 63 (D.D.C. 2003) (quoting Alfano v. Costello, 294 F.3d

365, 377 (2d Cir. 2002)).  This demanding test serves to "filter out complaints attacking 'the

ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-

related jokes, and occasional teasing.'"  Faragher, 524 U.S. at 788.

Here, the plaintiff's hostile work environment claim is based upon (1) alleged workplace hostilities toward the plaintiff by Section Chief O'Brien; (2) exclusion of the plaintiff from significant management decisions and opportunities; and (3) the alleged relinquishing of the plaintiff's management duties.  Pl.'s Opp'n at 89-90.  For clarity, the Court will again set forth individually the facts relevant to each aspect of the claim.

### (1)    Factual Allegations

### (a)    Section Chief O'Brien's Actions

As to this aspect of the claim, the plaintiff avers that O'Brien, her immediate supervisor beginning in 1994, harassed her on a daily basis and in a manner which exceeded his harassment of white employees.  Pl.'s Opp'n at 9.  For example, according to the plaintiff, O'Brien frequently screamed at her over the telephone, talked to her in a condescending tone and did not seek her advice on matters directly related to her area of expertise.  Id.  As a result of these indignities, the plaintiff asked to be transferred from O'Brien's supervision, but this request was denied, even though a white female who was in a support position was transferred at her request from O'Brien's supervision.  Id. at 10.  The plaintiff contends that O'Brien's harassment only intensified after she was selected to be the Unit Chief for the new litigation unit in 1997.  Id.  For example, after this reassignment, O'Brien directed the plaintiff to move into a new office, which she claims was "filthy, unfurnished, had poor ventilation, and had never been used as a unit chief's office in the past."  Id. at 11.  Additionally, the plaintiff was not permitted to move the furniture from her old office to her new office and was denied a speaker telephone even though lower-ranked white support personnel had one.  Id.  Finally, the plaintiff alleges that O'Brien diminished by one-third the office space of the Litigation Unit, which deprived the plaintiff of

sufficient space for her staff.  Id.

### (b)  Exclusion from Management Decisions and Opportunities

The plaintiff also alleges that her hostile work environment claim is based upon her

exclusion from management decisions and opportunities.  Pl.'s Opp'n at 11-13.  Specifically, the

plaintiff contends that in 1997 O'Brien claimed that he had forgotten to include the plaintiff's

unit in a funding request to Congress for additional staffing necessary to address the substantial

FOIPA backlog.  Id.  Additionally, the plaintiff alleges that she was not consulted before the

FOIPA section was reorganized, even though white employees, who did not have her experience

or qualifications, were consulted.  Id.  Similarly, after being reassigned to head the new litigation

unit, the plaintiff suggests that O'Brien attempted to dissuade employees from transferring to her

unit.  Id.  In addition, the plaintiff alleges that she was excluded from participating in (1) a

meeting with the then-Attorney General Janet Reno; (2) the Classification Manual Project, a

project which had a direct impact on her unit; and (3) the annual Intelligence Community

Information and Classification Management Conference.  Id. at 12-13.

### (c)  Depletion of the Plaintiff's Management Responsibilities

Finally, the plaintiff asserts that her reassignment to the position of Unit Chief of the new

Litigation Unit eventually resulted in the depletion of her management responsibilities.  Pl.'s

Opp'n at 13.  Specifically, the plaintiff alleges that O'Brien engaged in a successful campaign to

have one component of the unit—the classification appeals function—removed from her control.

Id. at 13-14.

### (2)  Analysis of the Defendant's Challenges

An examination of the totality of the circumstances in this case leads the Court to the

conclusion that the plaintiff has failed to set forth evidence sufficient to support her Title VII

hostile work environment claim.  In other words, the plaintiff's evidence, when viewed in its

totality, does not show that she was subjected to working in a workplace that was so permeated

"with discriminatory intimidation, ridicule, and insult that [was] sufficiently severe or pervasive

to alter the conditions of the [her] employment . . . ."  Barbour, 181 F.3d at 1347-48.  Although

the plaintiff alleges a number of circumstances, which she insists supports her hostile work

environment claim, the evidence regarding these incidents consists solely of her own conclusory

allegations with no other factual support.  In fact, the plaintiff relies almost exclusively on her

answers to defendant's interrogatories, Pl.'s Ex. 18, as the factual support for this claim.  See

Pl.'s Opp'n at 9-13.  Upon reviewing the evidence, it is clear that the plaintiff's hostile work

environment claim cannot be sustained because she has failed to demonstrate that she suffered

intentional discrimination because of her race or gender.  See Sullivan-Obst v. Powell, 300 F.

Supp. 2d 85, 97 (D.D.C. 2004).  Furthermore, "the lack of credible or corroborative evidence

offered with respect to the claim[] [of a hostile work environment] justifies a ruling for the

defendant."  Id. (citing Greene v. Dalton, 164 F.3d 671, 675 (D.C. Cir. 1999); Richard v. Bell

Atl. Corp., 209 F. Supp. 2d 23, 35 (D.D.C. 2002)).

In Bryant v. Brownlee, the plaintiff asserted a multitude of incidents which she alleged

supported her hostile work environment claim.  Bryant, 265 F. Supp. 2d at 63.  For example, the

plaintiff stated, among other things, that her supervisor would accept telephone calls while they

were in meetings; her supervisor would only communicate with her through hostile emails; the

plaintiff's business cards and lumbar support pillow were taken from her; her supervisor delayed

signing her workman's compensation papers; and management refused to allow the plaintiff

sufficient time to prepare for a fact-finding and mediation conference concerning her

discrimination complaints.  Id. at 62-63. A member of this court concluded that although the

plaintiff had alleged a plethora of incidents, her hostile work environment claim was deficient

because "none of the allegations [gave] rise to an inference of discrimination by [the] defendants

based on race, color or age." Id.; see Sullivan-Obst, 300 F. Supp. 2d at 96-97; Lester v. Natsios,

290 F. Supp. 2d 11, 22-23 (D.D.C. 2003).  For the same reasons that the plaintiff's claims in

Bryant were deficient, so is the plaintiff's hostile work environment claim in this case.

The plaintiff here has alleged, as set forth above, a multitude of incidents that allegedly

demonstrate that she was subjected to working in a hostile work environment.  However, based

upon the evidence presented to this Court, which consists almost entirely of the plaintiff's own

allegations, this Court cannot conclude that her claims have racial or gender-related overtones.

Despite the on-going hostile work environment that the plaintiff claims existed, and the number

of incidents alleged, she only identifies a handful of incidents where she alleges she was treated

differently than white employees.  Specifically, she was not transferred from working under

O'Brien's supervision, but a white support staff female was, Pl.'s Opp'n at 10; she did not

receive a speaker telephone while some lower-ranked white support staff members did, Pl's

Opp'n at 11; Collingwood consulted with white employees within the division on the subject of

restructuring the Litigation Unit, but not with her, Pl.'s Opp'n at 12; and some of the appeals

classification function was transferred to Nancy Seward, a white woman.  Pl.'s Opp'n at 14.

These allegations are simply insufficient to establish a hostile work environment claim.[6]  First,

---

[6] Of these incidents, the defendant concedes that in at least three of them, the white employee was a female, thus belying any claim of a hostile work environment claim based on gender as to these allegations.

the incidents appear to allege that the plaintiff's hostile work environment claim can be based upon the aforementioned claims of disparate treatment.  While "disparate treatment can support a claim of hostile work environment, in order to do so 'it must be shown that had the plaintiff been white she would not have been treated in the same manner.'"  Johnson v. DiMario, 14 F. Supp. 2d 107, 109 n.3 (D.D.C. 1998) (citing Villines v. United Brotherhood of Carpenters and Joiners of America, AFL-CIO, 999 F. Supp. 97, 103 (D.D.C. 1998) (internal quotation marks omitted)). The plaintiff has made no attempt to show that these individuals were similarly situated to the plaintiff so that an inference could be drawn that if she was white, she would have been treated differently.  Moreover, after a review of all the evidence presented by the plaintiff, it is clear that the plaintiff's claims are simply attacking "the ordinary tribulations of the workplace, . . . ." Faragher, 524 U.S. at 788.  Therefore, this Court cannot conclude that the evidence presented by the plaintiff demonstrates that she was in a work environment that was so permeated "with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment . . . ." Barbour, 181 F.3d at 1347-48 (citing Oncale, 523 U.S. at 75).  Accordingly, this Court will grant the defendant's motion for summary judgment on this claim.[7]

---

[7] The defendant also argues that the plaintiff was not a victim of a hostile work environment because she did not receive a Quality Step Increase while under the supervision of O'Brien and Collingwood or because her request for time-off awards for her staff was not approved.  Def.'s Mem. at 45-46.  The plaintiff does not respond to these arguments, thus this Court concludes that she concedes these aspects of the claim and that further analysis on these points is unnecessary.

**(C)     The Fitness for Duty Examination Claims**

**(1)     Title VII Claims**

**(a)     The Discrimination Claim**

The plaintiff contends that the defendant discriminated and retaliated against her in violation of Title VII, when she was compelled to participate in a fitness-for-duty ("FFD") mental examination.  Pl.'s Opp'n at 48; Compl. ¶¶ 16-19.  As already discussed, to sustain a claim of discrimination under Title VII, "the plaintiff must establish that (1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination." Russell v. Principi, 257 F.3d 815, 818 (D.C. Cir. 2001) (quoting Brown v. Brody, 199 F.3d 446, 452 (D.C. Cir. 1999)).  As to this claim, it appears that the defendant is only challenging its viability because the plaintiff has failed to present any evidence that supports an inference of discrimination, thus conceding that the plaintiff has satisfied the remaining prongs of the test.  Def.'s Reply at 30.  In opposition to the defendants's position, the plaintiff alleges that discrimination can be inferred because (1) the decision to send her for a psychological evaluation was not properly based on medical grounds, FBI regulations, or a proper medical report and (2) other similarly situated individuals were permitted to return to work despite having serious medical or behavioral problems.  Pl.'s Opp'n at 59-63.  Thus, the question before the Court is whether the evidence in the record supports an inference that the plaintiff was required to undergo the psychological FFD examination in violation of Title VII. Based upon this evidence, the Court concludes that this claim survives the defendant's motion for summary judgment.

As to whether there were medical reports that justified requiring the plaintiff to submit to

the evaluation, the plaintiff asserts that Dr. Yoder's report was erroneous, discriminatory, and afforded no basis for the referral for the psychological evaluation.  Pl.'s Opp'n at 55.  To support her claim that the report was merely a pretext for discrimination, the plaintiff notes, among other things,[8] that the decision to send her for the psychological evaluation was made before Dr. Yoder's report was issued and the FBI received the supplemental report from Dr. Welsing.  Pl.'s Opp'n at 52.  Specifically, the decision to refer the plaintiff for a psychological evaluation was made on April 12. 2000.  Def.'s Ex. 52.  However, Dr. Yoder's report was not issued until May 9, 2000, Def.'s Ex. 55, and Dr. Welsing's supplemental report was not submitted until April 13, 2000.  Pl.'s Ex. 25.  In addition, the record evidence shows that Bartnik never even discussed the plaintiff with Dr. Yoder prior to making the decision to mandate the psychological examination.  Pl.'s Ex. 28 (Yoder Deposition) at 48, 61-62.

FBI regulations state:

An agency may order a psychiatric examination (including a psychological assessment) only when:

(i)  The result of a current general medical examination which the agency has the authority to order under this section indicates no physical explanation for behavior or actions which may affect the safe and efficient performance of the individual or others, or

(ii)  A psychiatric examination is specifically called for in a position having medical standards or subject to a medical evaluation program established under this part.

5 C.F.R. § 339.301(e) (emphasis added).  By using identical language in the April 12, 2000 letter

---

[8]  The plaintiff also spends a great deal of time discussing perceived errors in Dr. Yoder's report.  Pl.'s Opp'n at 21-23.  However, because the decision to have her undergo the psychiatric evaluation occurred before the report was issued, the report could not have impacted that decision and any errors in the report are therefore immaterial.

sent to the plaintiff, it was clear that the defendant was requiring the plaintiff to submit to the psychological evaluation pursuant to § 339.301(e)(i).  See Def.'s Ex. 52 (letter to the plaintiff stating that "the [FBI] is authorized to order a fitness-for-duty (FFD) psychiatric examination, including a psychological assessment, of an employee when there is evidence of behavior or actions which may affect the safe and efficient performance of the individual.") (emphasis added).  While there are other provisions that would have permitted requiring the evaluation,[9] the language of the letter requiring the examination mirrors that of § 339.301(e)(i).  Having relied on this provision in making its determination to order the psychological assessment, it is that provision against which the plaintiff's pretext claim must be evaluated.

The circumstances surrounding the mandate that the plaintiff submit to the psychological examination here appear to indicate that the FBI, and in particular Bartnik, failed to properly follow FBI procedure before requiring the examination, which on its face appears to require the existence of a "current general medical examination" before a psychological examination can be ordered.  Because the results of the "general medical examination" had not been issued prior to the order for the plaintiff to submit to a psychological evaluation (the medical report prepared by Dr. Yoder was issued on May 9, 200, and the psychological examination was ordered on April 12, 2000), a fact finder could infer that the order for the psychiatric evaluation was made with discriminatory intent, as it was ordered in violation of the agency's own regulation which it relied upon at the time as grounds for requiring the examination.  Accordingly, the defendant's

---

[9]  See, e.g., 5 C.F.R. § 339.302 (allowing the agency to offer a examination where the agency needs more information); MAOP, Part I 20-5.5.2(2), 20-5.5.3 (allowing for psychological FFD's pursuant to 5 C.F.R. § 339.301) at Def.'s Ex 47.

summary judgment motion as to this claim must be denied.[10]  Compare Moore v. Summers, 113

F. Supp. 2d 5, 29 (D.D.C. 2000) ("Adherence to an established agency policy . . . goes a long

way in rebutting any inference of discrimination or retaliation . . . .").

>          (b)       **The Retaliation Claim**

To establish a retaliation claim under Title VII, the plaintiff must show that (1) she

engaged in a protected activity; (2) she suffered an adverse employment decision or action; and

(3) there is a causal link between the protected activity and the employment decision or action.

Thomas, 131 F.3d at 202.  With regard to the retaliation claim, the defendant alleges that the

plaintiff has failed to satisfy the third prong of the test—a causal link between the protected

activity and the adverse employment action.  Def.'s Mem. at 68.  Specifically, the defendant

contends that a causal link cannot be established because too much time had elapsed (over a year

and a half) between the filing of the plaintiff's last EEO complaint and the decision to send her

for a mental evaluation.[11]  Id. at 69-70.  Moreover, the defendant notes that the decision to send

her for the psychological evaluation was made by Bartnik and his staff, who had no connection to

the plaintiff's EEO activity.  Def.'s Mem. at 62-63.

In Hazward, the court specifically rejected the theory that mere proximity in time to the

protected activity and the adverse employment action is sufficient to satisfy the causal link

element.  Hazward, 14 F. Supp. 2d at 124-25.  As the court in Hazward stated, "[a] showing of

---

[10]  Had the agency first had the results of the general medical examination and its results justified
the plaintiff being required to submit to a psychological examination, this Court would have to conclude that the
psychological examination was properly ordered, thus precluding a factfinder from inferring discriminatory intent.
The same would probably be true if the record unequivocally established that Dr. Yoder had verbally expressed his
conclusion that a psychological examination was merited before his report was actually issued.

[11]  See Def.'s Ex. 15 (copies of the plaintiff's EEO complaints dated between 1993 and 1998).

mere temporal proximity, without more, fails to demonstrate the required causal connection between the protected activity and the adverse employment action." Id.  Furthermore, case law in this jurisdiction requires that the plaintiff demonstrate that the decision maker, not just some other employee of the company, was aware of the protected activity.  Buggs v. Powell, 293 F. Supp. 2d 135, 150-51 (D.D.C. 2003) and cases cited therein (concluding that the plaintiff was unable to establish a prima facie case of retaliation because the selecting official was unaware of the protected activity); Laboy v. O'Neil, 180 F. Supp. 2d 18, 26 (D.D.C. 2001) (holding that summary judgment was appropriate when the plaintiff failed to demonstrate that the decision maker had knowledge of the protected activity).  Accordingly, the Hazward court concluded that a causal connection could not be proven solely based on the temporal proximity of the employee's protected activity to his termination and general "company" knowledge of his protected activity.  See Mitchell v. Baldrige, 759 F.2d 80, 86 (D.C. Cir. 1985) (stating that the causal connection may be established by "showing that the employer had knowledge of the employee's protected activity, and that the adverse personnel action took place shortly after that activity.") (emphasis added).

In this case, it is undisputed that Bartnik and his staff made the decision to send the plaintiff for the psychological FFD examination in Chicago.  Def.'s Ex. 52 (April 12, 2000 letter from Bartnik to the plaintiff); see also Pl.'s Opp'n at 19 (citing Def.'s Ex. 57); Def.'s Mem. at 52 (citing Def.'s Ex. 57).  Thus, to support her claim for retaliation, the plaintiff must demonstrate a causal link between her protected activity and the adverse employment action, in this case, the requirement that she submit to the psychological evaluation.  As to this claim, the plaintiff has simply attempted to string together various non-related facts in the record, which she claims

supports the retaliation claim.  However, her creative attempt to construct a retaliation claim

from these facts must be rejected.  This result is called for because even if the plaintiff has

presented facts that support an inference of retaliation, she has failed to introduce any evidence

that would support even an inference that Bartnik was aware of the plaintiff's EEO activities.

However, the plaintiff also contends that Bartnik did not act alone in deciding to have her submit

to the FFD examination.  Id. at 50.  Although the plaintiff references no record evidence that

supports this argument, it appears she may be referring to the fact that following her request to

return to work, a meeting was held with "personnel from FOIPA, employee benefits, and HCPU"

to discuss the plaintiff's ability to return to work.  Pl.'s Ex. 28 (Yoder deposition) at 95.  The

evidence indicates that both Yoder and Kelso attended the meeting.  Id.  Thus, it appears that the

plaintiff is contending that Kelso, who opined that the plaintiff's return would be disruptive

because of an inspection that was scheduled to commence, Pl.'s Ex. 26, interceded to ensure that

the plaintiff would have to participate in the FFD examination.[12]  Pl.'s Opp'n at 50.

The lapse of time between the protected activity and the adverse employment action also

undermines the viability of the plaintiff's retaliation claim.  The length of time between the filing

of the last EEO complaint and the requirement that the plaintiff submit to the psychological

examination was almost a year and a half.  This hiatus is far too great, in the absent of other

evidence, to demonstrate a causal link.  See Brodetski v. Duffey, 141 F. Supp. 2d 35, 43 (D.D.C.

---

[12]  The plaintiff also spends time discussing the fact that Kelso was designated to communicate with the doctors at the Isaac Ray Center about her.  According to the plaintiff, this is yet another link that supports her retaliatory chain.  However, the fact that Kelso talked to the doctors is of no moment, because those discussions were conducted after the decision to send the plaintiff for the evaluation was made.  Thus, because these actions occurred after the alleged discriminatory action was taken, they fail to provide support of a causal connection between the alleged protected activity and the adverse employment action.  Cf. Hayslett v. Perry, 332 F. Supp. 2d 93, 98 (D.D.C. 2004) (concluding that the plaintiff could not establish a prima facie case of retaliation because several of the alleged retaliatory acts predated the protected EEO activity.)

2001)("[a]lthough courts have not established the maximum time lapse between protected Title VII activity and alleged retaliatory actions for establishing a causal connection, courts generally have accepted time periods of a few days up to a few months and seldom have accepted time lapses outside of a year in length."); see also Buggs, 293 F. Supp. 2d at 148.  This is so even though Bartnik participated in the meeting concerning the plaintiff's return to work, as did Kelso.  There is simply no evidence that any protected activity was discussed at that meting.  And the plaintiff has failed to put forth any other evidence to establish a causal connection between her EEO activity[13] and the decision to send her for the psychological evaluation.[14]  Accordingly, the defendant is entitled to summary judgment on the plaintiff's retaliation claim.

     **(2)**       **The Rehabilitation Act Claim**

The Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability" may be discriminated against by a federal agency "solely by reason of her or his

---

[13]  The plaintiff also appears to allege that she engaged in another protected activity which occurred so close in time to the alleged discriminatory employment action that a permissible inference can be drawn that a causal link exists between two.  Pl.'s Opp'n at 49.  However, it is unclear from her papers what this protected activity is.  It seems she might be suggesting that when she informed Dr. Yoder of her continued concerns about racial problems at the FBI, which were later memorialized in his report, she was engaging in a protected activity.  However, this Court simply does not understand how the plaintiff can construe this as a protected activity.  To the extent Dr. Yoder included the plaintiff's concerns in his report, he was simply recording a remark made by the plaintiff, which was then used to help assess her fitness to return to work.

[14]  In an attempt to bridge the extensive gap in time between the filing of her EEO complaints and the requirement that she submit to the psychological evaluation and therefore defeat the defendant's lack of proximity in time argument, the plaintiff alleges that the decision to send her for the evaluation occurred around the same time it became known, based on Dr. Yoder's report, that the plaintiff had continuing concerns about racial issues at the FBI.  Pl.'s Opp'n at 49.  This argument has no merit.  First, although the plaintiff's concerns were shared with Dr. Yoder during her March 29, 2000 physical examination, Dr. Yoder's report was not issued until May 8, 2000, Def.'s Ex. 55, and the decision to refer the plaintiff for the psychological evaluation had already been made on April 12. 2000.  Def.'s Ex. 52.  Thus, even assuming that the plaintiff engaged in a protected activity by sharing her concerns with Dr. Yoder, because Dr. Yoder's report was not issued until after the decision was made to send her for the psychological examination, and there is no evidence that Bartnik conferred with Dr. Yoder prior to making his decision, there is no basis for a retaliation claim, since the alleged retaliatory act occurred before the decision maker knew about the alleged protected activity.

disability . . . ."  29 U.S.C. § 794(a).  "The standards used to determine whether this section has

been violated in a complaint alleging employment discrimination under this section shall be the

standards applied under [certain provisions of] the American with Disabilities Act

["ADA"] . . . ."  29 U.S.C. § 794(d).  Under the ADA, it is unlawful to "discriminate against a

qualified individual with a disability because of the disability of such individual in regard to job

application procedures, the hiring, advancement, or discharge of employees, employee

compensation, job training, and other terms, conditions, and privileges of employment."  42

U.S.C. § 12112(a).  A "qualified individual with a disability" is defined as "an individual with a

disability who, with or without reasonable accommodation, can perform the essential functions

of the employment position that such individual holds or desires."  42 U.S.C. § 12111(8).

"Accordingly, an individual with a disability is 'qualified' if he or she can perform the essential

functions of the position with a reasonable accommodation."  Breen v. Dep't of Transp., 282 F.3d

839, 841 (D.C. Cir. 2002) (citing Carr v. Reno, 23 F.3d 525, 529 (D.C. Cir. 1994)).  Under the

ADA, an individual has a "disability" if he:  (1) has a physical or mental impairment that

substantially limits one or more of his major life activities; (2) has a record of such an

impairment; or (3) has been regarded as having such an impairment.  42 U.S.C. § 12102(2) .

Thus, to establish a prima facie case of discrimination under the Rehabilitation Act, the plaintiff

must show that she (1) is an individual with a disability (2) who, with or without reasonable

accommodation, can perform the essential functions of the position, and (3) who suffered an

adverse employment decision due to her disability.  Chinchillo v. Powell, 236 F. Supp. 2d 18, 23

(D.D.C. 2003).

　　　　In this case, the defendant contends that the plaintiff has failed to establish that she has a

disability as required by 42 U.S.C. § 12112(a).  Def.'s Mem. at 72-73.  The plaintiff argues,

however, that both § 12112(a) and § 12112(d)(4)(A) apply in this case.  The Court will address

each argument in turn, beginning with the § 12112(d)(4)(A).

> Under § 12112(d)(4)(A)
>
> [a] covered entity shall not require a medical examination and shall not make inquiries of
> an employee as to whether such employee is an individual with a disability or as to the
> nature or severity of the disability, unless such examination or inquiry is shown to be job-
> related and consistent with business necessity.

According to the plaintiff, her Rehabilitation Act claim should survive the defendant's motion for

summary judgment because there is a factual dispute as to whether the FFD she was administered

was job related and consistent with business necessity.  Pl.'s Opp'n at 58-60.  After a careful

review of the record evidence submitted to this Court, it is clear there are material facts in dispute

concerning the plaintiff's Rehabilitation Act claim and thus this Court is precluded from granting

the defendant's motion for summary judgment on this claim.

The defendant admittedly sets forth a compelling argument regarding why the FFD was

job-related and consistent with business necessity.  According to the defendant, because the

plaintiff was out of work for approximately a year and a half during which she claimed that she

was unable to work based upon a psychiatric diagnosis, the agency clearly had good cause for

trying to determine whether the plaintiff was capable of performing her job.  Def.'s Reply at 35.

Moreover, the defendant opines that despite having a desk job, the plaintiff's status as an FBI

Special Agent required that she satisfy the physical and psychological qualifications for carrying

a firearm and she could possibly be "deploy[ed] in the field in the case of emergencies."  Id. at

36.  The plaintiff counters that the examination was not essential to her job because (1) the

psychological examination did not meet the requirements of 5 C.F.R. § 339.301(e); (2) there was

no relationship between the referral and the qualifications the plaintiff needed to perform her

actual job responsibilities, i.e., the doctors at the Isaac Ray Center did not conduct a job-

relatedness assessment; and (3) the psychological examination was not part of the regular fitness-

for-duty process, so it cannot be argued all agents are required to submit to one.  Pl.'s Opp'n at

60-63.

The District of Columbia Circuit has not had the opportunity to interpret

§ 12112(d)(4)(A) in a context analogous to this case.[15]  Other Circuit Courts, however, have

clearly held that when health problems have affected an employee's job performance, the

employer can require the employee to undergo an examination "designed to determine his or her

ability to work, even if the examination might disclose whether the employee is disabled or the

extent of any disability.  If such an examination is governed by the provisions of

§ 12112(d)(4)(A), it is covered by the business necessity exception."  Yin v. California, 95 F.3d

864, 868-69 (9th Cir. 1996) (discussing physical examinations); see also Tice v. Centre Area

Transp. Auth., 247 F.3d 506, 517-18 (3d Cir. 2001) (concluding that a request for an independent

medical examination was consistent with business necessity); 29 C.F.R. § 1630.14(c) ("A

covered entity may require a medical examination (and/or inquiry) of an employee that is job-

related and consistent with business necessity. A covered entity may make inquiries into the

ability of an employee to perform job-related functions.").

In Yin, the plaintiff worked as a tax auditor for the State of California and used sick

leave, vacation time in lieu of sick leave, and dock time in lieu of sick leave at rates much greater

---

[15] In Doe v. U.S. Postal Serv., 317 F.3d 339 (D.C. Cir. 2003), the Circuit Court examined
§ 12112(d)(4)(A) as it relates to the Family and Medical Leave Act, but the analysis in that case is not applicable to
the case at hand.

than other tax auditors.  Yin, 95 F.3d at 867.    After a number of absences, the State requested

that the plaintiff supply them with a copy of her medical records and submit to an examination;

the plaintiff refused and filed suit.  Id.   The district court concluded that the request fell under

the business necessity exception of § 12112(d)(4)(A) and thus did not violate the Rehabilitation

Act.  Id. at 867-68.  On appeal, the Ninth Circuit affirmed, concluding that there was nothing in

the record to suggest that Yin's supervisors were attempting to discover whether Yin had a

disability.  Id. at 868.  Rather, their ultimate purpose was an attempt to determine whether the

plaintiff was capable of performing her job.  Id.  Accordingly, the court concluded that ordering

the medical evaluation was appropriate.  Similarly, in Tice, a former Centre Area Transportation

Authority employee brought an action alleging violations of the ADA for, among other things,

requiring that he submit to a medical examination before returning to work after being on

extended leave after sustaining an on-the-job back injury.  Tice, 247 F.3d at 509-10.  Tice had

previously attempted to return to work after submitting multiple releases from his doctor.  Id. at

511.  Upon receipt of the releases, the defendant requested more information, and finally after not

being satisfied with the certifications from Tice's doctor, the defendant ordered him to submit to

an independent medical evaluation.  Id.  The Third Circuit, citing Yin, concluded that under

§ 12112(d)(4)(A), the request for the independent medical evaluation was consistent with

business necessity.  Id. at 517-18.

This Court finds the analyses in Yin and Tice convincing, however, the record evidence

in this case is not as clear as were the circumstances presented to the courts in those cases.  As

already noted, the evidence in this case can lead to the conclusion that the plaintiff's

psychological examination was ordered in violation of FBI regulation 5 C.F.R. § 339.301.

Accordingly, because an inference of discrimination is raised by this apparent violation, this same inference will permit a fact finder to conclude that Bartnik's decision to require the plaintiff to submit to the evaluation was not solely for the purpose of determining whether she was capable of performing her job.  Moreover, there is evidence in the record that the doctors who evaluated the plaintiff were not familiar with her job responsibilities.  See  Pl.'s Ex. 31 (Bartnik Deposition) at 57-58.  Accordingly, these circumstances raise a material question of fact as to whether the psychological examination would accurately serve as a means of determining whether the plaintiff could fulfill her job responsibilities.  This is significant because the Tice court noted that such an examination should, "at a minimum, be limited to an evaluation of the employee's condition only to the extent necessary under the circumstances to establish the employees's fitness for the work at issue."  Tice, 247 F.3d at 514-15 (citing Sullivan v. River Valley Sch. Dist., 197 F.3d 804, 811-12 (6th Cir. 1999)).  For the aforementioned reasons, this Court must deny the defendant's motion for summary judgment on the plaintiff's Rehabilitation Act claim because there are material facts in dispute as to whether requiring the plaintiff to submit to the psychological evaluation satisfied the business necessity exception.

The plaintiff also argues that pursuant to 42 U.S.C. § 12112(a) she was "regarded" as disabled by the defendant as a result of being required to undergo the psychological examination.  Pl.'s Opp'n at 64.  The defendant contends, however, that the plaintiff has failed to establish a prima facie case as to this aspect of her Rehabilitation Act claim because she has failed to establish that the FBI regarded her as having a disability.  Def.'s Reply at 39.  An individual is disabled within the meaning of the Act if she has a "'(i) physical or mental impairment which substantially limits one or more of such person's major life activities, (ii) has a record of such

impairment, or (iii) is regarded as having such an impairment.'"   Modderno v. King, 82 F.3d

1059, 1061 (D.C. Cir. 1996) (emphasis added) (quoting 29 U.S.C. § 706(8)(B)).   When

determining whether the plaintiff had a disability, "[t]he central inquiry must be whether the

claimant is unable to perform the variety of tasks central to most people's daily lives, not whether

the claimant is unable to perform the tasks associated with her specific job."   Toyota Motor Mfg.

Kentucky, Inc. v. Williams, 534 U.S. 184, 200 (2002).   The question this Court must address,

then, is whether a jury could conclude that the evidence in the record establishes that the

defendant regarded the plaintiff as having a physical or mental impairment which substantially

limited one or more major life activities.   Again, Tice presents a clear application of the law in

this regard.   In Tice, the plaintiff put forth an alternative argument that he was "regarded" as

disabled by his employer under 42 U.S.C. § 12112(a) because he was required to undergo an

independent medical examination.   Tice, 247 F.3d at 513.   The Third Circuit rejected the

plaintiff's argument, concluding that he had failed to put forth sufficient evidence to establish a

prima facie case that he had been regarded as disabled.   Id. at 516. The Court noted, however,

that

> this is not to say that a request for an [independent medical examination ("IME")], proper
> or improper, may not, taken in conjunction with other evidence or circumstances
> surrounding the request, establish that the employer regarded the employee as disabled.
> The important point is that the request and surrounding circumstances must establish that
> the employee was "regarded as" disabled within the meaning of the ADA.   See Sutton v.
> United Air Lines, Inc., 527 U.S.471, 490-93 (1999).   So, for example, if it turned out that
> the employer's examination was not limited to an assessment of those potential
> impairments that had occasioned the examination in the first place, but instead became a
> "wide-ranging assessment of mental or physical debilitation,"   Sullivan v. River Valley
> Sch. Dist., 197 F.3d 804, 812 (6th Cir. 1999), such evidence might be highly probative as
> to the nature of the employer's perception.   Further, a request for an examination, taken in
> conjunction with evidence suggesting that the employer had no reasonable basis for
> harboring doubts about the employee's ability to do his or her job in the first place, might

also be probative as to the nature of the employer's regard.  Thus, for Tice to use [his employer's] request for an IME to establish that [the employer] "regarded" him as substantially limited in the major life activity of working, he must raise a genuine issue of fact as to whether CATA's request evinced a belief that Tice was unable to work in a "broad class of jobs."

247 F.3d at 515-16 (emphasis added).

In this case, the only determination made by the agency was that the plaintiff was unable to return to her duties as a Special Agent.  There is no evidence in the record to indicate that the agency even contemplated making a determination of whether the plaintiff was limited in her ability to perform activities central to daily living or work in a broad class of jobs, let alone regarded her as disabled as required under the law.  In fact, at most, the agency only considered the plaintiff's condition to be temporary because they contemplated her return.[16]  Accordingly, the plaintiff's § 12112(a) claim has no merit.

**(D)     The 1999 Non-Selection as Section Chief**

The plaintiff also alleges that despite the defendant's knowledge of her desire to achieve SES status, she was not selected to replace Kevin O'Brien as Section Chief when he retired.  Pl.'s Opp'n at 89.  Rather, according to the plaintiff, the position was awarded to a less-qualified white male, John Kelso.  Id.  The plaintiff's argument regarding her non-selection to this position is without merit.  First, the plaintiff acknowledges that she was on medical leave when the position became available and she also did not apply for the position.  Id.[17]  However, she opines that

---

[16]  In fact, if a jury determines that ordering the medical examination was based on business necessity, in the absence of other evidence, the issuance of the order for a psychological examination would not demonstrate that the defendant "regarded" the plaintiff as substantially limited in a major life activity; rather, the order would simply show that the defendant harbored doubts about whether the plaintiff had the ability to perform her job.  Tice, 247 F.3d at 514-15.

[17]  The Court notes, however, that the Section Chief position announcement was dated November 13, 1998,

(continued...)

because it was known that she wanted an SES position, she should have been notified of the

opening.  To support her proposition, the plaintiff cites to Cones v. Shalala, 199 F.3d 512, 518

(D.C. Cir. 2000).  In Cones, the District of Columbia Circuit concluded that a plaintiff's failure to

apply for a position was irrelevant because the plaintiff had clearly expressed her interest in

applying for the position.  Id.  However, in Cones, the agency never opened the position for the

submission of applications, but rather laterally transferred someone into that position, making it

impossible in that case for the plaintiff to actually apply for the job.  Id.  Cones is simply not

analogous to the case at hand because the position in Cones was never opened, while that was

clearly not the case here.  Here, the record evidence shows that the position was announced to all

divisions of the agency on November 13, 1998.  Def.'s Ex. 85.  The plaintiff has not provided the

Court with any authority, and the Court has found none, for the proposition that the agency was

required to individually advise her of this vacancy.  Accordingly, the plaintiff has not met her

burden of establishing a prima facie case of discrimination because she failed to even apply for the

job.  Therefore, the defendant is entitled to summary judgment on this claim.[18]

## V.   Conclusion

For the foregoing reasons, this Court grants in part and denies in part the defendant's

motion to dismiss.

---

[17](...continued)
which was before the plaintiff left the office on extended medical leave.  Def.'s Ex. 85.  This fact is of no moment,
however, since the plaintiff never applied for the position.

[18]   The plaintiff also appears to allege that she was denied this position in retaliation for engaging in
protected activities.  Pl.'s Opp'n at 89.  However, the plaintiff only mentions a retaliation claim for this non-selection
in the heading for section III.B.5 of her brief and provides absolutely no discussion or citation to legal authority in
her brief which would permit this Court to review such an argument.  Even assuming that the plaintiff had argued
such a claim for relief, because she failed to even apply for the job, she cannot meet her prima facie case for
retaliation because there was no adverse employment action.

**SO ORDERED** this day of 21st day of January, 2005.[19]

REGGIE B. WALTON
United States District Judge

---

[19] An Order consistent with the Court's ruling accompanies this Memorandum Opinion.